In the Matter of MARY I—— et al., Petitioners, against CONVENT OF SISTERS OF MERCY IN BROOKLYN et al., Respondents.

In the Matter of DORIS K—— et al., Petitioners, against COMMISSIONER OF WELFARE OF THE CITY OF NEW YORK et al., Respondents.

Supreme Court, Special Term, Kings County, April 23, 1951.

*Max Schulman* for Mary I—— and another, petitioners.

*Louis A. D'Agosto* for Doris K—— and another, petitioners.

*James S. Brown, Jr.,* for Convent of Sisters of Mercy in Brooklyn, respondent.

*John P. McGrath, Corporation Counsel (Selma Tierstein* of counsel), for Raymond M. Hilliard, as Commissioner of Welfare of the City of New York, respondent.

*Frederick L. Kane* and *John Corbin* for Catholic Home Bureau for Dependent Children, *amicus curiæ.*

HART, J. P—— A—— T—— was born out of wedlock on July 16, 1946. Her mother, whose present whereabouts are unknown, authorized the commissioner of welfare of the City of New York to commit her, pursuant to which the commissioner committed the infant to the Angel Guardian Home, an agency conducted by the Convent of the Sisters of Mercy in Brooklyn, as a destitute and dependent child, and as a charge against the City of New York. On December 23, 1946, the Angel Guardian Home boarded out the child with Mr. and Mrs. I——. Prior thereto they executed a written application which acknowledged receipt of a copy of the rules of the Angel Guardian Home, among which was one that the child was to be returned on request of the home. Other children have at various times since then been boarded with them and subsequently returned to the home.

On January 4, 1951, over the objection of Mr. and Mrs. I—— the child was removed from their home by the Angel Guardian Home for the purpose of arranging adoptive placement. The request of Mr. and Mrs. I—— for permission to adopt the child was refused. Apparently there is a rule of the governing board that consent to adoption will not be forthcoming where the proposed foster parents are over forty years of age. At the time P—— was first boarded with them, Mrs. I—— was about thirty-seven and Mr. I—— forty-two.

On January 29, 1951, Mr. and Mrs. I—— sued out a writ of habeas corpus returnable on February 1, 1951. Upon the return of the writ the department of welfare of the City of New York intervened as a defendant. At that time evidence was adduced, but the hearing was not completed. The matter was adjourned to March 9, 1951. Pending the conclusion of the testimony the court directed that the child be given into the custody of Mr. and Mrs. I—— without prejudice to a further disposition upon final conclusion of the testimony. It appears further, that on January 29th or 30th, about the time the writ was obtained, the department of welfare in endeavoring to locate the mother of the infant, communicated with her sister, Mrs. K——, who it is claimed, then learned for the first time, of the existence of her niece. She and her husband thereafter obtained a writ of habeas corpus, joining as respondents all the parties in the first proceeding. On the return day, by consent, this matter was referred to this court and the parties agreed at the hearing on March 9, 1951, that the two writs be tried together and that the evidence adduced at the first hearing be deemed to have been

the proof offered in both proceedings. In passing it may be noted that the claim that Mrs. K—— was ignorant of her niece's existence taxes the court's credulity. It is conceded that her sister, Mrs. C——, knew of the birth of the child and that Mrs. K—— visited her. It seems incredible that she was not apprised by Mrs. C—— of the fact. True, she was not married at the time and therefore was unable to care for the child. Moreover only recently did she learn, after two miscarriages, that it was dangerous for her to bear children. The court, however, in view of all the circumstances, finds it difficult to credit her testimony that she was without knowledge that her sister Helen had given birth to a daughter.

From the evidence adduced at the hearing and from my personal observations of the parties and the child, I am satisfied that the petitioners I—— should retain custody. A contrary result would do irreparable and permanent harm to the child.

The testimony of the neighbors, friends and of the parish priest who frequently visited petitioners I——, and who are fully familiar with them and their environment, satisfies me that the child could not be better cared for by the kindest and most indulgent natural parents. She is maintained in a home in a rural setting, having her own bedroom, a large yard including her own small swimming pool. She regards the I——s as her parents. She was brought to them at the age of six months and is now four and one half years of age. It is but natural, therefore, that she regards Mr. I—— as her father and Mrs. I—— as her mother. The genuine affection and devotion of these people for the child was testified to by the witnesses but what is of greater importance, are the manifestations of love and affection of the child for the I——s which were observed by the court. The I——s have two sons, one of whom is married. The other is in the armed forces. The infant regards them as her brothers. At one of the hearings the court observed the affection and attachment of the infant for her " brother " in uniform. When she was first produced, after being in the custody of the Angel Guardian Home for approximately three weeks, she was suppressed and quiet. Upon the day on which the hearing was resumed, after having been again in custody of the I—— family for about four weeks, she was cheerful, buoyant and had appeared to have gained weight.

Dr. Reder, a competent psychiatrist, whose testimony is completely credited by the court, testified that in his opinion the uprooting of this infant from the place she calls home and away

from a family she believes hers, would have a permanent dele-
terious psychological effect. It was his opinion, which the court
accepts, that the mental trauma accompanying this separation
would cause a harmful result from which she would never fully
recover. This opinion was concurred in by the parish priest,
who testified on petitioners' behalf as follows: " Q. Father, can
you give an opinion as to whether it would be injurious and
damaging to the child if it were permanently removed from
the present surroundings? A. I have always stated that — I
think I stated it to the Judge once before — that I felt the child
in the early stages of its life is dreadly affected by these things,
and you will hear children after a while talking, especially when
that child is older, mentioning they don't know what it is con-
nected with in their early life. I think it upsets the child men-
tally and physically, and you will see that happening time and
time again. The teachers in the school will call you down and
say, ' What's the matter with this child? ' You examine the
home life and so forth — you will find the child being affected
by all those things."

The testimony of Dr. Reder and of the parish priest adds
substance to the expression of the court in *Matter of Bock* (280
N. Y. 349, 353): " The surroundings and associations of the
young have so great an effect upon their outlook and so form
the basis of their future development that nothing can prevent
the courts from considering the human aspects of the question
presented."

The testimony given by respondents' experts with respect to
this aspect of the matter was not effective to overcome the
court's acceptance of Dr. Reder's statements and the testimony
of the parish priest.

In opposing the writ respondents urge (1) that they have a
superior right to custody of the child; (2) that the court's
equity powers should not be exercised so as to destroy the
effectiveness of the placement and boarding programs and prac-
tices established by the public and private welfare agencies,
and that (3) the transfer of custody to the boarding parents
would not be in the best interest of the child.

These contentions will be treated in inverse order for the
reason that in a habeas corpus proceeding the prime question
is, what would best serve the interests and welfare of the child.

Bringing the problem before the court into clear focus and
demonstrating beyond cavil the duty devolving upon it is the
statement in *Matter of Lee* (220 N. Y. 532, 538): " Further-

more, it was the duty of the court in a proceeding involving the custody of the child to look solely to his welfare and to decide accordingly. (*People ex rel. Pruyne* v. *Walts,* 122 N. Y. 238, 241; *People ex rel. Elder* v. *Elder,* 98 App. Div. 244, 246; *Matter of Knowack,* 158 N. Y. 482, 491; *Ullman* v. *Ullman,* 151 App. Div. 419.)''

Allusion may also be made to the language in the opinion of Mr. Justice WALTER in *People ex rel. Harris* v. *Commissioner of Welfare of City of New York* (188 Misc. 919, 923) and repeated by him in *People ex rel. Michael* v. *Michael* (188 Misc. 901, 903): '' By virtue of its general equitable jurisdiction, this court may order and direct as to the custody and control of infants within the State, and may exercise its jurisdiction to do so either upon writ of habeas corpus or upon petition. (*Finlay* v. *Finlay,* 240 N. Y. 429, 432.) *In all such cases, the guiding principle, the paramount and controlling consideration, is the welfare of the child* (*People ex rel. Sisson* v. *Sisson,* 271 N. Y. 285, 287; *Matter of Lee,* 220 N. Y. 532, 538; *People ex rel. Pruyne* v. *Walts,* 122 N. Y. 238, 242; *People ex rel. Sternberger* v. *Sternberger,* 12 App. Div. 398; *Matter of Rich* v. *Kaminsky,* 254 App. Div. 6; *Matter of Meyer,* 156 App. Div. 174, 176; *Matter of Gustow,* 220 N. Y. 373, 377; *People ex rel. Glendening* v. *Glendening,* 259 App. Div. 384, 393, affd. 284 N. Y. 598), *and to achieve that welfare the court may take the infant from a parent or legal guardian* (*People ex rel. Pruyne* v. *Walts, supra; Wilcox* v. *Wilcox,* 14 N. Y. 575; *Matter of Lee, supra*), *from a charitable agency* or a *welfare commissioner* (*People ex rel. Our Lady of Victory I. Home* v. *Venniro,* 126 Misc. 135; *People ex rel. Converse* v. *Derrick,* 146 Misc. 73 ''. (Emphasis supplied.) (See, also, *Walch* v. *Walch,* 52 N. Y. S. 2d 697, 701; *Ex parte Szczygiel,* 51 N. Y. S. 2d 699, 702, 703; *People ex rel. Heller* v. *Heller,* 184 Misc. 709; *People ex rel. Riesner* v. *New York Nursery & Child's Hosp.,* 230 N. Y. 119, 124, and *Matter of Vanderbilt* v. *Carew,* 242 App. Div. 482, 484.)

The evidence heretofore discussed leads the court inescapably to the conclusion that the welfare and the best interests of the child would be promoted by the exercise of its equitable jurisdiction in favor of sustaining the writ on behalf of the I———s. More forcefully expressed, I am satisfied that a denial thereof would cause serious adverse consequences to the child.

Respondents' contention that the result arrived at would impair the effectiveness of the placement system is without persuasive force on the merits of this case. Most apt in its application to the consideration of this contention is the lan-

guage of Mrs. Justice HARRIS in *People ex rel. Converse* v. *Derrick* (146 Misc. 73, 78): '' This office of the Supreme Court descends from King to Chancery and from Chancery to the Supreme Court of this State. Born in a time when the question of custody could be changed on the misbehavior of parents or of guardians chosen by parents, *this power must still be available even in these days of social service organizations and welfare officers so that errors of heart or errors of judgment on the part of officials, * * * can be remedied by the court.''* (Emphasis supplied.)

The placement system in these particular proceedings must yield to the welfare of the individual child. This court refuses to sacrifice this infant's interests because of a claim that the interests of children, not before the court, will be affected by a possible impairment of a placement system, nor is the fact that the result reached may be operative as a precedent in future cases of any great moment. Each case will require an approach with respect to the facts therein presented and weighed accordingly. In other cases there may well be lacking the fact here presented of permitting an infant of the age of six months to remain in a boarding home for four years with the resultant attachment of the child for the boarding parents. The importance of this fact is exemplified by the testimony of the parish priest as follows: '' The Witness: For every rule there is always an exception of some kind, and in this particular case I felt it was a terrible injustice to the child to take that child out of those surroundings, especially when they have had it so long.''

Moreover, respondents' contention that their rights of custody are superior to those of petitioner is ineffective and unpersuasive. This argument is predicated on section 603–2.0 of the Administrative Code of the City of New York, sections 371, 373 *et seq.,* of the Social Welfare Law and with emphasis on the italicized portion of subdivision 2 of section 383, which provides: '' 2. The custody of a child placed out or boarded out and not legally adopted or for whom legal guardianship has not been granted shall be vested during his minority, or until discharged by such authorized agency from its care and supervision, in the authorized agency placing out or boarding out such child, *and any such authorized agency may in its discretion remove such child from the home where placed or boarded.''* (Emphasis supplied.)

These statutes, however, do not and cannot affect the equitable powers of the court to arrange for custody with a view to the

best interests of the child. This power is inherent in the Supreme Court and may not be abrogated by statute (*People ex rel. Riesner* v. *New York Nursery & Child's Hosp., supra,* p. 124; *Walch* v. *Walch, supra*; *People* v. *Riley,* 188 Misc. 969).

As expressed in *People ex rel. Sisson* v. *Sisson* (153 Misc. 434, 435): " ' The statutes which have been passed in England * * * and in this State from the time of its first organization, have not been intended to detract from its force but rather to add to its efficiency * * *. This writ cannot be abrogated, or its efficiency curtailed, by legislative action.' (*People ex rel. Tweed* v. *Liscomb,* 60 N. Y. 559, 566.) "

Nor does the fact that petitioners (I——) agreed at the time the child was first boarded with them to return her upon demand preclude them from maintaining this proceeding. " This power [to determine custody by a writ of habeas corpus] of the State and function of the Supreme Court evidently transcends legislative action and contract between individuals [citing cases]". (*People ex rel. Converse* v. *Derrick, supra,* pp. 77–78.)

The approach to the problem in the instant case is not by the avenue of weighing the respective claims of rights of custody as urged by respondents. This is made crystal clear by the recent case in the Appellate Division, First Department, in *People ex rel. Hagan* v. *Alfano* (277 App. Div. 565). There, relator, an unoffending father, sued out a writ seeking to regain custody of his infant child from the sister of his deceased wife, with whom the infant had resided for several years, for the purpose of placing the infant with his brother's family who were " virtual strangers to the child." (P. 566.) Special Term sustained the writ. As stated by the Appellate Division the impression as gained from the opinion of the lower court indicates that the result there arrived at was made by an approach to the problem from the viewpoint of the father's rights. In reversing the order and remanding it to Special Term for further testimony the Appellate Division stated: " We think, however, that closer consideration should be given to the welfare of the child, less colored by a consideration of the father. The case is one where if either party may see fit to call him, the observations and opinion of a doctor or child specialist might be helpful ". (P. 566.)

Such testimony as there suggested by the Appellate Division has been had in the present case and has been most persuasive upon the court in concluding that custody should be granted to the I——s.

Upon the final hearing counsel for the Angel Guardian Home, upon being questioned by the court, readily admitted that if the child were released to its custody she would be turned over to Mr. and Mrs. K—— because of her blood relationship. Certainly where, as in *People ex rel. Hagan* v. *Alfano* (*supra*) the Appellate Division held that a father could not as a matter of right change custody of a child from one of its blood relatives to another, *a fortiori*, a welfare agency may not transfer custody merely because of the blood relationship of one of the parties who is a virtual stranger to the child. The best interests of the child remain at all times the criterion of the issues.

In reaching the conclusion arrived at, this court is cognizant of the fact that it is not in accord with that expressed in *People ex rel. Our Lady of Victory I. Home* v. *Venniro* (126 Misc. 135). The result reached in that case, however, was predicated on the question of superior right of custody, which test this court finds unacceptable.

Moreover, this court does not feel constrained to follow the decisions of its learned colleagues in *Matter of Convent of the Sisters of Mercy* v. *Barbieri* (200 Misc. 112) and in *Matter of Michelic* (200 Misc. 114). The former decision was premised on the theory that to allow the boarding parents to retain custody might impair the placement system of the welfare agencies, which result the court was anxious to avoid. As heretofore noted, this court believes the welfare and well-being of this infant should not be made subordinate to the functioning of a system. The decision in the *Michelic* case relied on the *Barbieri* and *Hagan* v. *Alfano* (*supra*) cases as decided in Special Term. As heretofore noted the latter case has been reversed.

One matter deserving further comment, though in the nature of obiter, is the contention of respondents that the child's welfare would not be promoted because of the inability of Mr. and Mrs. I——. to adopt her, the intimation being that the consent therefor would be withheld by respondents and by Mrs. K——. The question of adoption or its frustration is not controlling on these habeas corpus proceedings. Moreover, it may well be that if the result reached in this case is sustained, that a Surrogate may find that lawful custody, as is here determined, is in Mr. and Mrs. I—— and not in that of the authorized agency and that the consent of respondents as indicated in section 111 of the Domestic Relations Law is unnecessary. Nor is there any requirement by statute that consent of an aunt is a necessary condition precedent to adoption.

Petitioners K—— have utterly failed to satisfy the court that the welfare of the infant will be promoted by placing custody in them or in granting them any rights of visitation. The writ obtained by them is dismissed. The writ on behalf of Mr. and Mrs. I—— is sustained.

Submit orders directing that the papers in these proceedings be sealed.