Lestes. Holtzman, J.
In this proceeding on a writ of habeas corpus the petitioners seek an order of this court directing the respondents Anonymous and the New York Foundling Hospital to return custody of the infant Laura to them.
At a hearing on this writ the proof adduced that on May 27, 1963 petitioners entered into a written agreement with the respondent Foundling Hospital whereby the petitioners agreed to provide their home for the temporary foster care of such children as the respondent Foundling Hospital should assign to them. From 1963 to 1968 some 13 children were placed in the foster home of the petitioners who, in the words of the Foundling Hospital’s own case xyorker, Mrs. Agnes Cook, were “gifted” foster parents. Also in evidence is the Foundling Hospital’s personal record of the petitioners, which is replete with glowing reports on the petitioners, husband and wife, and the warm and loving home which they provided for the children assigned to them.
Laura was boarded with the petitioners pursuant to this agreement on October 25,1966, at which time she was five days’ old and in poor physical condition. Through the loving care and attention of the petitioners infant Laura grew to be a healthy and happy baby. At that time petitioner husband was age 47 and his wife was age 45. The record discloses that as early as March 31,1967 petitioners, who had grown increasingly fond of the infant, made inquiries about the possible adoption or indefinite “ long term care ” of Laura. Such requests were repeatedly made to the Foundling Hospital for over two years, but always “discouraged” by the respondent because of the petitioners’ ages.
In or about October of 1968 Laura’s natural mother signed a formal surrender of the infant in favor of the Foundling Hospital which, in effect, gave the legal custody of the child to the respondent hospital (Social Services Law, § 384) and made the child finally eligible for adoption. The petitioners were immediately informed that there would be a “ showing ’ ’ of Laura to prospective adoptive parents on November 18, 1968. On this date Laura was brought to the hospital by the petitioner. The hospital then displayed the child to the prospective adoptive parents, respondents Anonymous,' husband and wife. The latter requested, and'rightfully so, that, although they thought the *139 infant was lovely, they be permitted to visit with her several times in order to reach a decision as to whether or not to adopt her. They Avere informed that this was impossible, since the hospital Avas faced with an “ emergency situation ” created by the foster parents’ repeated requests for adoption. They were further informed that their decision must be immediate and based solely on this single meeting with the child. The respondents Anonymous decided on adoption and the infant was turned over to them four days later, on November 22, 1968. At that time, the respondents husband and wife were ages 44 and 39, respectively.
It was not until June 20,1969 that the present writ was sworn out and served upon the respective respondents. To a large extent the basis of the Avrit is a recent legislative amendment (Social Services Law, § 383, subd. 3, added by L. 1969, ch. 1080, eff. May 26, 1969) which mandates that authorized adoptive agencies give first preference to temporary foster parents as prospective adoptive parents of a child who has been boarded with them for two years or more. Truculent opposition to the writ by the respondent hospital was based primarily upon the contractual arrangements between the petitioners and the respondent hospital and further based upon the broad discretionary powers granted to the respondent hospital as an authorized agency defined under section 371 of the Social Services Law, and as set forth in section 383 of that law with respect to the care and custody of children entrusted to them.
In this respect both sides have failed to come to grips with the paramount issue. For apart and aside from any statutory or contractual considerations, the only issue herein involved is ‘ ‘ how will the interests and Avelfare of the infant Laura best be served? ” Should she remain Avith her adoptive parents or should she be returned to the custody of her foster parents? (Finlay v. Finlay, 240 N. Y. 429; People ex rel. Riesner v. New York Nursery & Child’s Hosp., 230 N. Y. 119; Matter of Mary I. v. Convent of Sisters of Mercy, 200 Misc. 115; see, also, memorandum decision of this court, Anonymous v. New York Foundling Hosp., N. Y. L. J., Aug. 19, 1969, p. 10, cols. 7, 8). The court is of the opinion that both the petitioners and the respondents Anonymous are sincere when they urge that they are thinking only of the best interests of Laura. Regrettably, the same cannot be said of the respondent hospital.
This court cannot, by being silent, condone the methods utilized by the Foundling Hospital in this case. The Legislature has seen fit to place a public trust in the hands of the Foundling-Hospital and similar agencies. Nevertheless, it would appear *140 from the evidence and from the manner in which the Foundling Hospital opposed the petitioners that it executes its public trust as if it were a cold and heartless business. It views the desire of loving, selfless and well-qualified foster parents to provide a permanent home for a child they consider their very own daughter as an “ emergency situation ’ ’ which must be frustrated by immediate adoption by adoptive parents who are total strangers to the child. In furtherance of this end it denies the request of prospective adoptive parents to 1 ‘ get to know ’ ’ the infant before making what was probably the most important decision of their married life and the child’s future. Callously it aborts a child from ‘1 her entire cosmos ’ ’, the only home she has known for the first two years of her life, not necessarily because it is in the best interests of the child, but for the preservation of their power of ultimate determination — a rationale quite common in big business but wholly unjustified in an agency such as the respondent hospital. How else can one explain why adoption is denied to apparently well-qualified foster parents because they were “ too old ” and adoption is granted to prospective adoptive parents who are only slightly younger. The responsibility for the present situation and the sadness it has brought to innocent victims must be placed squarely upon the shoulders of the respondent Foundling Hospital.
This court is well aware of the stringent statutory requirements which must be met by an organization such as the respondent hospital before receiving the approval and authorization of the State and the extreme difficulty on the part of the State in supervising every minute detail of such an organization’s operation. However, this case has presented such a shocking display of the misuse of the unfettered discretionary power granted to the respondent hospital and similar agencies by statute that it is the court’s opinion the Legislature might be well advised to review such practices and the law which sanctions them.
This modus operandi although deplorable cannot be the basis upon which the present decision must rest, for the sole, paramount and controlling interest of the court is the well-being of Laura. Mindful of its obligation, the court appointed an eminently qualified author and child psychiatrist, Dr. Stella Chess. Upon the stipulation and consent of all parties her report was introduced into evidence. (Kesseler v. Kesseler, 10 N Y 2d 445.) It was Dr. Chess’ opinion, after interviewing both the petitioners and the respondents Anonymous, along with the child herself, that although a substantial disservice was done to the child by removing her from the home of the petitioners, in the *141 year that has passed since this traumatic 6 ‘ upheaval ’ ’, the child has developed affectionate ties with her new set of parents, whose handling of her has been ‘ ‘ excellent ’ It was the doctor’s recommendation that in order to avoid further emotional trauma the child should remain in the home of her current adoptive parents. The petitioners produced a physician who offered testimony contradictory to that of Dr. Chess but this witness was admittedly not a child psychiatrist and his findings and conclusions were based solely on an interview of the petitioners.
It is now incumbent upon this court to reach a decision in this matter and in so exercising its discretionary prerogative the court does not labor under the delusion that it is either endowed with the omniscience of a divinity or the sublime wisdom of a Solomon standing between two mothers with a baby in one hand and a sword in the other. This task is not made easier in view of the fact that the court finds that both the petitioners and the respondents Anonymous are equally qualified to be the parents of this child. Both would furnish the loving, tender care and type of home necessary for the proper upbringing of this child. Nevertheless a decision must be made between the two and, as Mr. Justice Cardozo once stated, the court must put itself in the position of a “ ‘wise, affectionate and careful parent ’ * * * and make provision for the child accordingly.” (Finlay v. Finlay, supra, pp. 433-434.)
After hearing all the evidence and observing all the parties and in view of the report of Dr. Chess and the length of time that the child has been with the respondents Anonymous, this court cannot cause the child further trauma by now removing her from the warm, affectionate, loving home now provided for Laura by the respondents Anonymous. It is the court’s opinion that Laura should remain where she is and not be returned to the petitioners. It is hoped, despite the injustice and heartbreak they undoubtedly suffered when the child was removed from their home, that the petitioners will understand and realize that the court is only thinking of the best interests and welfare of Laura.
Accordingly, the petitioners’ writ of habeas corpus and the proceeding thereon are dismissed, without costs, fees, disbursements or expenses to any party. The infant Laura is remanded to the care, custody and control of the respondents Anonymous.