In the Matter of ALAN D. M. (ANONYMOUS) et al., Respondents, v NASSAU COUNTY DEPARTMENT OF SOCIAL SERVICES et al., Appellants.

Second Department, June 13, 1977

*James M. Catterson, Jr., County Attorney (Matthew A. Tedone* and *Natale C. Tedone* of counsel), for appellants.

*Stephen Gassman* for respondents.

MOLLEN, J. In this habeas corpus proceeding to have the Nassau County Department of Social Services return an infant to the petitioning potential adoptive parents, the appeal is from a judgment of the Supreme Court, Nassau County, entered September 23, 1976, which sustained the writ.

We modify the judgment, on the law, by adding thereto a provision restraining the petitioners-respondents from continuing with adoption proceedings for a period of six months, and providing that during that period the petitioners and the child are to undergo therapy and counselling at the North Shore Child Guidance Clinic, and that the appellants will continue supervision of the adoptive placement.

This habeas corpus proceeding involves the physical custody of a young boy (John) who was placed with the petitioners (Mr. and Mrs. M) for the purpose of adoption and who was removed by the respondents-appellants (Department) nine months after the placement. The removal was precipitated by a severe spanking administered by Mrs. M, which left superficial bruises over large parts of John's buttocks and thighs.

Mr. and Mrs. M commenced this habeas corpus proceeding to have John returned to their care. At all times, the Department has had legal custody of John; the natural parents are not at all involved in this proceeding.

The primary issue on appeal is whether it is in the child's best interests to sustain the writ and return him to the petitioners. Since this determination is largely factual, the circumstances are set forth at length.

The petitioners applied to the appellant Department, for the purpose of adopting a child, on July 8, 1974. After an extensive home study, the petitioners were approved as potential adoptive parents in February, 1975. Pursuant to an adoptive placement agreement, John was placed in petitioners'

home on March 14, 1975. Although an adoptive placement agreement anticipates adoption, it does not constitute formal consent to adoption as required by section 111 (subd 1, par [d]) of the Domestic Relations Law. Prior to the commencement of adoption proceedings, there is a probationary period, during which the authorized agency supervises the adoptive placement and gathers information pending final determination on the question of consent to the adoption. When John was removed from the petitioners' home on December 11, 1975, formal adoption proceedings had been commenced and the adoption had been recommended by the Department caseworker who supervised the placement. There is uncontradicted testimony that, during the nine months of placement, John made substantial improvement in his social, psychological, physical and intellectual development.

John was born on August 4, 1971. The natural mother was addicted to heroin and John suffered withdrawal symptoms at birth. The foster mother who cared for John before the adoptive placement believed that John was hyperactive. The Department caseworker communicated her belief to Mr. and Mrs. M. When John was first placed, he had poor speech and nervous eye movements. He frequently picked his nose, causing nosebleeds. He also had nosebleeds in stressful situations. John did not relate well to others and did not play well with other children. However, he was unusually agreeable in an effort to please adults. When placed, John was at least six months behind expected normal intellectual development.

During the nine months that John was in the care of Mr. and Mrs. M he made substantial improvement. Evaluation by the North Shore Child Guidance Clinic (there were two in-depth interviews of Mr. and Mrs. M and John, separated by a six-month interval) showed that John was thriving and that the petitioners were providing a good home in which he would continue to do very well. In addition, John's intellectual development had significantly accelerated, so that, at the time of the second interview, he was within acceptable limits of expected development. John's speech had greatly improved, and he had learned to express preferences. The nervous eye movements and the nosebleeds had stopped. John's social behavior and attentiveness developed, and he learned to play with other children. John regularly attended church, Sunday school and nursery school. Mr. and Mrs. M always appeared as caring and concerned parents who were happy and proud of

John, and he appeared happy and at ease with them. John obviously had made significant progress in petitioners' home.

During this period, a Department caseworker made several visits to the petitioners' home for the purposes of evaluating the adoptive placement and helping Mr. and Mrs. M and John adjust to each other. The last scheduled visit was on November 14, 1975. After that visit the caseworker recommended that the adoption proceed. A review of the testimony indicates that the caseworker was generally quite positive about John's placement with petitioners. Her reports supported the testimony that Mr. and Mrs. M were devoted to John and loved him very much and that John seemed happy and well received by petitioners and the community.

There were some minor areas of concern involving several incidents. As a result of these incidents, the caseworker suggested that Mr. and Mrs. M consult the North Shore Child Guidance Clinic in order to facilitate John's integration into the home. The M's and John attended the clinic at their own expense.

The clinic's evaluation was extremely positive to the effect that the petitioners represented a good placement for John. The incidents were apparently considered minor since no objection to the adoption was ever voiced on those grounds. Until December, 1975, it appeared that there would be no impediment to the adoption.

On December 8, 1975 the Department received a report that John had been severely beaten by Mrs. M. The report was investigated that evening by a caseworker from the Protective Services Division of the Department and, the next day, by the caseworker who had been supervising the placement. Mrs. M told the caseworkers that she had given John a very hard spanking and that she had stopped when she realized that she was hurting him. The spanking caused bruises on John's buttocks and upper thighs. Both caseworkers testified that they were horrified by the extent of the bruises. The caseworkers also emphasized that the petitioners did not seem properly remorseful for having hurt the child.

The spanking occurred on the afternoon of December 5, 1975. John had been mischievous all day; the spanking occurred when John refused to get undressed to take a nap. The spanking was apparently the culmination of several difficult weeks, during which John had been largely confined to the house due to illness and bad weather. It is not disputed that

the spanking was severe; however, other than crying while being spanked, the child exhibited no pain or discomfort and demonstrated no degree of traumatization.

At the prompting of the caseworker from the Child Protective Services, Mrs. M took John to the pediatrician on December 9, 1975. Upon examining John, the pediatrician found several areas of hematomas and ecchymosis (black and blue marks), all superficial and not particularly large or severe. John exhibited no discomfort or anxiety, and no treatment was required.

The bruises looked like a series of small marks, probably caused by the flat of a hand as in a hard spanking. Mrs. M told the doctor what had happened and seemed quite remorseful. The pediatrician testified that, in his opinion, the incident did not constitute abuse and that it seemed to be nothing more than a good spanking.

The initial decision to remove John was made on December 9 by supervisory personnel who had no personal knowledge of the incident or of the relationship between Mr. and Mrs. M and John. The decision was largely based upon the oral reports of the caseworkers; however, the caseworkers were not involved in the final decision making process. The decision to remove John was made without the benefit of the pediatrician's report, without consultation with Mr. and Mrs. M, without consultation with the appropriate staff of the North Shore Child Guidance Clinic and without investigation to determine whether the spanking had been an isolated incident. Neither of the caseworkers took the position that John was in any immediate danger; thus there was no emergency situation present which would have precluded a more thorough investigation.

The decision to remove John was largely premised on the spanking administered by Mrs. M, and on the Department's inferences that the petitioners have a low frustration tolerance and that severe spankings would be repeated. The Department drew these inferences from the child's lack of traumatization and the apparent lack of remorse exhibited by the petitioners. The Department apparently attributed lack of trauma to previous spankings. These conclusions were contradicted by (1) the report of the caseworker who had been supervising the placement, following her December 10 meeting with the petitioners, in which she noted that they were very remorseful and that removal might not be the best

approach; (2) the pediatrician's opinion that the child was not hurt and that Mrs. M was very upset about having spanked the child; and (3) the unanimous opinion of the clinical team at the North Shore Child Guidance Clinic that the petitioners did not fit the pattern of child abusers, and that removal would not be in the child's best interests. Despite this evidence to the contrary, the decision to remove John was adhered to, and he was taken from the the petitioners' home on December 11, 1975. The Department also advised the petitioners that it would not consent to the petitioners as adoptive parents.

The petitioners commenced this habeas corpus proceeding in an effort to have John returned to their care. The courts of this State have repeatedly recognized the availability of a writ of habeas corpus as a proper means of determining the custody of children (see *Matter of Kurtis v Ballou,* 33 AD2d 1034). This recognition is inherent in the traditional judicial function of *parens patriae,* which remains available despite the active existence of social service organizations. Nor can this traditional function be abrogated by statute, since it is founded in the equity powers of the court, as derived from the chancery (see *Matter of Mary I. v Convent of Sisters of Mercy in Brooklyn,* 200 Misc 115, 122). In *People ex rel. Riesner v New York Nursery & Child's Hosp.* (230 NY 119, 124), the Court of Appeals said that the writ of habeas corpus "extended to controversies touching the custody of children, which were governed, not so much by considerations of strictly legal rights, as by those of expediency and equity and, *above all, the interests of the child"* (emphasis supplied; see, also, *People ex rel. Converse v Derrick,* 146 Misc 73).

In exercising their traditional equity powers, courts have been guided by the principle that the paramount, if not the sole, determining factor is the best interests of the child. Furthermore, it is the purpose of a habeas corpus proceeding to allow the courts to make an independent judgment of the child's welfare, and not to be bound by an agency determination. The continued vitality of an independent judicial determination is apparent from the broad powers of review and independent investigation granted to the Surrogate's Court in adoption proceedings (see Domestic Relations Law, § 112).

The continued utilization of the "best interests" standard in child custody habeas corpus proceedings has not been diminished with the advent of the Department of Social Services.

The speedy and careful determination of the very difficult questions concerning a child's custody must be approached on an individual basis, carefully weighing the circumstances of each case. The doctrinaire or standardized approaches of an authorized agency or placement system must give way to the more urgent needs and problems of each individual child *(Matter of Mary I. v Convent of Sisters of Mercy in Brooklyn,* 200 Misc 115, *supra).*

Therefore, a mere determination that an authorized agency has not acted unreasonably, is insufficient. Instead, the more difficult determination as to what is in the child's best interests must be resolved. That highly sensitive and, at times, most difficult determination must be made on the basis of no criteria other than the furtherance of the child's welfare and best interests.

There is no precise formula to be used in evaluating a child's welfare. All would agree that it would be in John's best interests to be adopted into a loving family. Until December 5, 1975, the petitioners unquestionably appeared to be such a family.

The record persuasively demonstrates that, prior to December 5, 1975, the placement was deemed desirable. John regularly attended nursery school, Sunday school and church. Witnesses from each of these organizations testified to the tremendous progress which they had observed in John's development. John appeared happy and Mr. and Mrs. M appeared to be loving and concerned parents.

Until the spanking incident, the Department caseworker felt that the placement was viable. Although there were some minor areas of concern, the over-all tenor of her reports was that John was thriving and that Mr. and Mrs. M were devoted to him. That there were areas of concern is natural. It must be expected that there will be some difficulties in integrating a five-year-old child into a middle-aged, childless family.

There is no question that Mrs. M administered a harsh spanking on December 5, 1975. However, that one incident is an insufficient basis upon which to remove John from what otherwise appears to be an excellent placement. The subjective evaluation of the caseworkers that they were horrified by the spanking is of little persuasive value. Their conclusion that Mr. and Mrs. M lacked remorse is also subjective and is contradicted by the testimony of other witnesses.

The decision to remove John was made with extreme haste.

The caseworkers agreed that John was in no immediate danger, yet he was removed without benefit of either a thorough investigation or an in-depth consultation with the petitioners, or others who had knowledge of the relationship between John and Mr. and Mrs. M. Based solely on the isolated spanking, under all of the circumstances present herein, the removal of John was an abuse of discretion, as well as contrary to a thoughtful evaluation of John's best interests.

The inference that the petitioners have a low frustration tolerance and that the incident may be repeated is premised only on the one spanking. It is at least equally possible, and more likely, that the spanking was an isolated aberration which will not be repeated. Although there can be no certainty, there can be an informed analysis based upon far more complete information. The Department did not seek such information; instead it made a hasty and arbitrary decision. The Department's zeal, insofar as it concerns John's physical well being, is commendable. However, we hold that its precipitate action was not in furtherance of John's long range best interests.

The petitioners have demonstrated the potential of being loving parents who have provided, and will continue to provide, John with a good home. It is certain that John thrived in the environment provided by the petitioners. It is desirable to maintain the viable placement which the petitioners have provided. In this case, it will be in John's best interests to be returned to what has been a loving and caring environment.

The Department has argued that in evaluating a child's best interests, it is necessary to consider the child's future status. It has also indicated that it will not consent to the adoption of John by the petitioners, and that without its consent the adoption cannot be formalized. Therefore, it is contended, it is not in John's best interests to be returned to a family which cannot adopt him. These contentions must be rejected.

It is well established that legal rules should not be inflexibly applied to custody cases. The individual factors of each case are controlling. An inflexible standard as to what factors are pertinent should not be applied when evaluating a particular child's welfare.

In the case at bar, the Department's refusal to consent to adoption is more properly an issue to be finally decided by the Surrogate as part of the general review of the proposed

adoption. The ultimate question of adoption need not be controlling on the resolution of a writ of habeas corpus. The custody of a child, as raised in a habeas corpus proceeding, is governed by equity. The Supreme Court has broad equitable powers which extend beyond the strictures of any particular statute. While adoption is strictly governed by statute, custody is largely governed by equity. When there is a conflict, the best interests of the child must control. Rather than deciding the issue of consent, as raised in an adoption proceeding, Special Term was only concerned with the immediate custody of John. The issue of consent is not properly raised until adoption proceedings are before the Surrogate. The bootstrap argument that the writ should be denied because the Department will not give its consent to adoption must be rejected, thereby leaving the issue of consent to the Surrogate's review of the proposed adoption.

We have directed that the petitioners refrain from continuing with the adoption proceeding for a period of six months. During that period of time, the petitioners and John are to undergo counselling at the North Shore Child Guidance Clinic, and the appellants are to continue supervision of the adoptive placement.

In six months, when the petitioners reinstitute adoption proceedings, the Department will be in a better position to rationally exercise its discretion on the issue of consent to the adoption. Regardless of the eventual decision, the Surrogate is empowered to review the Department's determination in order to ensure that it has not unreasonably withheld its consent and to ensure the furtherance of the child's best interests (see Domestic Relations Law, § 112). The power of the Surrogate to review the Department's exercise of discretion concerning the issue of consent is inherent in the traditional role of the courts as *parens patriae.*

For the present, it is in the child's best interests to be returned to the care of the petitioners. The evidence is persuasive that the child will thrive in their home. The writ was properly sustained.

COHALAN, J. P., HAWKINS and O'CONNOR, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered September 23, 1976, modified, on the law, by adding thereto a provision (1) restraining petitioners from continuing with adoption proceedings for a period of six months, (2) directing

petitioners and the child to undergo therapy and counselling at the North Shore Child Guidance Clinic and (3) directing appellants to continue supervision of the adoptive placement. As so modified, judgment affirmed, without costs or disbursements.