OPINION OF THE COURT
Richard C. Delin, J.
In this private placement adoption, Cathy, the natural mother of Susan, born on October 21, 1976, and her husband, the alleged father, by order to show cause dated November 17,1977 request an order: (1) vacating and setting aside Cathy’s consent to Susan’s adoption; (2) dismissing the adoption proceeding filed by the respondents, Mr. and Mrs. M.; (3) requesting the court to determine the custody *869 of Susan; and (4) directing the respondents to deliver Susan to the petitioners.
Following extensive and protracted pretrial discovery by all parties, testimony was heard by Surrogate Bennett for 16 days commencing November 17,1978 and concluding on July 1,1980. The transcript is in excess of 2,100 pages with 23 exhibits in evidence. During the course of the discovery and hearing, the court rendered eight decisions, and the guardian ad litem appointed by the court to represent the interests of Susan filed three interim and one final report. On July 31, 1980, before he could render a decision, Surrogate Bennett retired, which requires this court to render a decision on a bitterly contested matter which it did not hear.
Powers incidental to the jurisdiction of the court under SCPA 209 (subd 9) empower the court, “To determine any unfinished business pending before its predecessor in office and to sign or certify papers or records left uncompleted or unsigned by its predecessor.”
The genesis of this subdivision is subdivision 9 of section 20 of the Surrogate’s Court Act, which in turn was derived from the Code of Civil Procedure (see Siegel, Practice Commentary, McKinney’s Cons Laws of NY, Book 58A, SCPA 209).
In Matter of Carey (24 App Div 531) the Surrogate took testimony in a will contest but died prior to rendering his decision. His successor, pursuant to a motion, requested counsel for both parties to appear before him and furnish any additional testimony they desired. On completion of the additional testimony, he rendered a decision upholding the will. The contestant, claiming he was entitled to a hearing de nova, appealed. The Appellate Division held that the successor Surrogate had the authority to decide the issues upon the whole record made by his predecessor without the necessity of a hearing de nova (see, also, Matter of Goldthwaite, 125 Misc 265, 266). This continuity is not applicable to other courts (Katz v McCosh, 19 Misc 2d 627, 629).
In the case sub judice on July 1,1980 at the conclusion of the testimony of petitioners’ last witness, Surrogate Ben *870 nett asked counsel whether anyone desired to submit any additional testimony. Upon being informed that none did, he stated that the hearing was closed. The court then asked whether any counsel wished to submit any additional papers. Counsel for the respondents replied in the negative; counsel for the petitioners requested three weeks; and the guardian ad litem requested time to file his report. Judge Bennett then stated that the matter would be submitted for decision on July 23, 1980 subject to the guardian ad litem’s report, reminding counsel to serve upon opposing counsel any papers filed with the court.
In Matter of Lawrence (58 NYS 597) and Matter of Johnson (27 Misc 167) the Surrogate suggested that in order for a successor in office to complete the unfinished business of his predecessor, a notice should be given to all parties that a successor would complete the unfinished business pending before his predecessor. Surrogate Varnum, who decided both of those cases, stated that the sole purpose of the motion was to bring the matter before him “for the continuance and completion of the proceedings, and to afford the parties an opportunity to submit additional testimony or to be heard” (Matter of Johnson, supra, p 167). However, it is apparent that no further testimony is required here since all parties rested on July 1,1980 and had filed all papers that they wished the court to consider. Any further motions would only serve to delay the decision in this matter.
On October 21, 1976 Cathy, who was then 15 years of age, unmarried, and a ninth-grade high school student living with her parents, gave birth to Susan. On October 26, 1976, while Susan was still in the hospital, Cathy signed a consent to the adoption of Susan by Mr. and Mrs. M. in the presence of her mother, aunt, and respondents’ attorney and his wife, who arranged for the delivery of Susan to her by Cathy’s mother. On October 27, 1976 Cathy’s mother Lucille, with Cathy present, took Susan from the hospital and delivered her to the wife of the attorney retained by the respondents for Susan’s adoption, who in turn delivered Susan to the adoptive parents later that same night. Cathy never saw Susan. On June 17,1977 Cathy and Joseph were married in Biloxi, Mississippi.
*871 Following the issuance of the order to show cause, petitioners obtained a writ of habeas corpus from the Supreme Court of Nassau County, alleging that Susan was being illegally detained and physically and emotionally neglected by the respondents. Following a hearing, that court, by decision dated April 7, 1978, refused to intervene in the adoption proceeding here since the issues in both the habeas corpus and adoption proceedings were identical, and dismissed the writ on April 24, 1979.
While testimony was being taken, the Supreme Court of the United States rendered its decision in Caban v Mohammed (441 US 380) declaring section 111 (subd 1, par [cj) of the Domestic Relations Law unconstitutional insofar as it permitted the adoption of an out-of-wedlock child on the consent of the natural mother but did not require a like consent from the putative father. Joseph thereupon moved to dismiss the respondents’ adoption proceeding since he, the natural father, had not consented to the adoption. The respondents thereupon challenged Joseph’s status as the father of Susan.
By decision dated August 27, 1979, the court directed that a hearing be held limited to determining the status of Joseph as Susan’s father. Following the paternity hearing the court rendered a decision finding that by a preponderance of the evidence, Joseph was the father of Susan (Matter of Female F. D., 105 Misc 2d 131). At that time there was no statutory authority for the Surrogate’s Court to hold a paternity hearing. Since then the Legislature has added section 111-b of the Domestic Relations Law authorizing the Surrogate’s Court to determine paternity in the course of an adoption (L 1980, ch 575; see, also, Law Revision Commission Report to the Legislature on the effect of Caban v Mohammed, supra, NY Legis Doc, 1980, No. 65 [I]).
As a result of the holding in the Caban case and in an effort to supply court-requested guidelines, the Legislature amended sections 111 and 111-a of the Domestic Relations Law relating to private placement adoptions and the comparable provisions of the Social Services Law relating to agency adoptions to provide for consents by and notices to *872 the natural fathers of out-of-wedlock children in certain enumerated instances (L 1980, ch 575 [eff July 26, 1980, except for two subdivision provisions not applicable]). Under the 1980 amendments to section 111 of the Domestic Relations Law two new categories of individuals whose consent to an adoption are required have been added. One being a father of an out-of-wedlock child placed with adoptive parents more than six months after birth, and the other, a father of a child born out of wedlock who is under six months of age at the time of placement. The latter category, which this case would fall under, requires a consent only if three conditions are met: that the father has openly lived with the child or the child’s mother for a continuous period of six months preceding placement; that he has openly held himself out to be the father during such period; and has paid a fair and reasonable sum, in accordance with his means, for expenses in connection with pregnancy or birth of the child. While the father here could qualify under the second condition mentioned, the first and third condition disqualify him from the category. The result being that Joseph would not be one of those unwed fathers whose consent would be required even though the uncontradicted evidence adduced clearly reveals him to be a concerned, caring father entitled to the equal protection and due process rights granted him under the Caban case of which he would be deprived by the 1980 amendments. Since the amendments became effective prior to this court’s decision, they are applicable to this case (Matter of Ray A. M., 37 NY2d 619; Matter of Corey L v Martin L, 45 NY2d 383).
While legislative guidelines should be afforded to the courts, this case demonstrates that the legislative guidelines enacted are too restrictive and do not deal with the many, different Cohcm-type fact patterns that can be involved (see Equal Protection for Unmarried Parents, 65 Iowa L Rev 679; Caban v. Mohammed: Extending the Rights of Unwed Fathers, 46 Brooklyn L Rev 95; Note, Adoption: The Constitutional Rights of Unwed Fathers, 40 Louisiana L Rev 923). Accordingly, the court finds that insofar as this unwed father is concerned, subdivision (e) of section 111 of the Domestic Relations Law is unconstitutional and his consent to the adoption would therefore be required under the *873 Caban case unless for some reason, such as abandonment, that consent may be dispensed with.
The facts in the case at bar bear a remarkable similarity to those in People ex rel. Deborah G. v Doe (NYLJ, Dec. 19, 1979, p 15, col 5, affd 75 AD2d 810). The Appellate Division affirmed the order of the Family Court which directed the return of the infant to the natural parents’ custody, holding that the consent of the natural father, which was not sought or obtained, was required under Caban v Mohammed (441 US 380, supra) where the claim of abandonment was unsupported and found the natural mother’s consent tainted by family pressure.
There is abundant uncontradicted testimony that Joseph, upon learning of Cathy’s pregnancy, following a discussion with her concerning obtaining an abortion, accompanied Cathy to a municipal hospital for prenatal care; stated that he wanted his name on the baby’s birth certificate; and offered to pay for Cathy’s delivery, which was rejected by her mother. Cathy’s parents and siblings were hostile to him, denying him contact with Cathy as soon as they learned of her pregnancy, as well as subsequent to the birth of Susan.
The social worker for the hospital in which Cathy was confined during her childbirth testified that prior to Cathy’s admittance, she received a telephone call from a woman who said she was Joseph’s sister, informing the social worker that Cathy was scheduled to deliver a baby at the hospital and that Cathy was “going to be forced by her parents to give the baby up for adoption and that Joseph and his family did not want the child adopted but wanted to raise the baby themselves.” The sister asked the social worker for information on the rights of Joseph as the natural father to be designated as the father on the birth certificate. The social service worker then made inquiry of the Nassau County Department of Social Services Adoption Unit. She testified she was told that unless the couple were married, the natural father had no rights to the baby except by special court order which would give him the right [sic] to support the child, but not to care for it; that he could only be designated the father on the birth certificate if the natural mother signed an affidavit stating that Joseph was the father and *874 mailed the affidavit to the Bureau of Records in Albany. This information was related first to Joseph’s mother and then repeated to his sister.
Joseph testified about his attempts to visit Cathy in the hospital and see his child which were frustrated by hospital personnel as well as Cathy’s mother. He further testified that he made inquiry at the Family Court of Queen’s County, in which county Cathy and he resided, and of the Family Court of Nassau County, where the child was born, as to the necessary procedure to enable him to obtain custody of his daughter but apparently received no assistance.
Ultimately, Joseph consulted an attorney who had represented his family in a negligence action and was advised to marry Cathy. Since the consent of her parents was necessary in New York because she was under age, they traveled to Biloxi, Mississippi (Domestic Relations Law, § 7, subd 1; Matter of Powers, 96 Misc 2d 183 [the consent of a parent could not be directed even if unreasonably withheld]).
Joseph then retained his present counsel, using moneys obtained from the settlement of a negligence action, to institute this proceeding as well as the writ of habeas corpus previously adverted to. Joseph’s actions and conduct clearly negate any possible inference of an intent to abandon the child or to rid himself of parental obligations and parental rights (Matter of Corey L v Martin L, 45 NY2d 383, supra).
The issue of the validity of Cathy’s consent to the adoption is more difficult. The testimony adduced indicates that Cathy was an immature teen-ager under great emotional and mental stress because of her pregnancy and the problems caused by the birth of Susan. She was under great pressure from her family, particularly her mother, who made all of the arrangements for the surrender and adoption of Susan. Except for the discussions had with the hospital social worker, Cathy was not afforded an opportunity to discuss her problems, free from emotion and tension, so that she could choose from various alternatives available to her the one she desired.
Cathy was not permitted by her family to see Joseph, the father of her daughter, nor any member of his family, who *875 desired to raise Susan rather than give her up for adoption. Based upon the entire record, it is the court’s considered opinion that Cathy’s consent to the adoption was induced by the duress of her mother (State of New York ex rel. Deborah G. v Doe, NYLJ, May 8, 1980, p 12, col 2, affd 75 AD2d 810, supra; Matter of Male M., 76 AD2d 839; cf. Matter of E.W.C., 89 Misc 2d 64; Matter of T.W.C., 38 NY2d 128, affg 48 AD2d 893, affg NYLJ, Dec. 18, 1974, p 17, col 6). Cathy’s consent to the adoption must be set aside because of the duress exercised upon her by her mother. Notwithstanding a finding of duress which would invalidate the consent, there has been no showing of any unfitness or other circumstance on the part of the natural mother which would prevent her from withdrawing her consent (People ex rel. Kropp v Shepsky, 305 NY 465; People ex rel. Anonymous v Anonymous, 19 Misc 2d 441).
Accordingly, (1) the consent of Cathy to Susan’s adoption by respondents is set aside; (2) the adoption proceeding instituted by Mr. and Mrs. M. for Susan’s adoption is dismissed; and (3) although this court has the power to determine Susan’s custody and to order her returned to the petitioners or such other disposition, including transfer of the child to the Family Court (Domestic Relations Law, § 116, subd 2; Matter of Anonymous, 45 Misc 2d 814; Matter of Anonymous, 32 Misc 2d 683), the abrupt termination of Susan’s relationship with the respondents might prove disastrous for Susan’s well-being. Accordingly, this matter is referred to the Nassau County Family Court, which has the requisite support personnel in its probation department which this court lacks to make a proper determination in accordance with the best interests of Susan.