OPINION OF THE COURT
Harold Baer, Jr., J.
This proceeding was brought by Maureen M. Dunn against the respondents by way of a writ of habeas corpus premised upon the contention that the Catholic Home Bureau for Dependent Children (hereinafter CHB) and the future adoptive parents have no right to the custody of "Baby Girl” Dunn. The petitioner, a 28-year-old woman, gave birth to the child out of wedlock on April 6, 1986. Petitioner executed a surrender on May 1, 1986, pursuant to Social Services Law § 384. Mary and John Doe agreed to adopt petitioner’s infant and on April 10, 1986, the child was placed with them. They have commenced adoption proceedings in the Nassau County Surrogate’s Court. On May 21, 1986, petitioner changed her mind about the adoption and mailed a revocation of her surrender to CHB. The writ was allowed upon petition dated May 27, 1986.
Respondents, "John Doe” and "Mary Doe”, their true identities having been withheld in accordance with law, move to dismiss and/or transfer this proceeding to the Surrogate’s Court in Nassau County.
More particularly they contend that it is an abuse of discretion for this court to retain jurisdiction over this adoptive dispute and that the proper forum is the Nassau County Surrogate’s Court where the adoption proceeding is pending, that a writ of habeas corpus does not lie since at no time has CHB "illegally” or "improperly” detained the infant, and finally that certain required allegations are missing from the writ.
Clearly, the Supreme Court has the power to order and direct with respect to the custody of infants within this State upon a writ of habeas corpus. (Matter of Mary I. v Convent of Sisters of Mercy, 200 Misc 115 [Sup Ct, Kings County 1951].) The courts of this State have repeatedly recognized the availability of habeas corpus as an appropriate tool by which to determine the proper custody of children. (Matter of Alan D. M. v Nassau County Dept. of Social Servs., 58 AD2d 111 [2d Dept 1977].) The natural mother has a choice; she may bring a petition to revoke her consent in the Surrogate’s Court or *401 bring a habeas corpus proceeding in Supreme Court. (Matter of Anonymous, 45 Misc 2d 814 [Sur Ct, Westchester County 1965].) Further, a writ of habeas corpus does not necessarily have to be made by a person "illegally” imprisoned. The language in CPLR 7002 suggests that a writ of habeas corpus may be brought by or on behalf of a person illegally imprisoned or otherwise restrained.
Finally, the writ ought not be dismissed for a failure to set forth how the petitioner intends to care for the infant in the event she is awarded custody. The burden of proof, following the 1972 amendments to Social Services Law § 384, no longer rests on the shoulders of the adoptive parents to prove that the natural mother is unfit. Rather, since the above-referred to amendment became law, the petitioner is provided an opportunity to testify on that score at the hearing. (Matter of Natural Parents of "Nicky", 81 Misc 2d 132 [Sur Ct, Kings County 1975].)
Following the denial of these applications, a hearing to determine custody was conducted on July 2, July 8 and July 9, 1986. Concisely put, an agency adoption in New York State today must be accompanied by a "surrender instrument”. A surrender instrument executed by the natural parent or parents, pursuant to Social Services Law § 384, transfers care, custody and guardianship (Matter of Natural Parents of "Nicky", supra, pp 134-135). For the surrender instrument to be valid, it must be: (a) acknowledged or (b) executed in the presence of one or more witnesses (c) before a notary public and (d) recorded in the office of the county clerk or the principal office of the authorized agency. Here, Sister Rosalie Gilson witnessed the surrender, i.e, the natural mother’s signature, and her signature was later acknowledged. If the instrument was properly recorded, then all the required conditions for a valid surrender were met.
In addition, the surrender instrument must contain language with respect to revocation. In 1972, the Legislature added subdivision (5) to Social Services Law § 384 and that section reads in pertinent part: "no action or proceeding may be maintained by the surrendering parent or guardian for the custody of the surrendered child or to revoke or annul such surrender where the child has been placed in the home of adoptive parents and more than thirty days have elapsed since the execution of the surrender”. If 30 days have not elapsed since the execution of the surrender, a court may, if it is in the best interest of the child, return the child to the *402 natural parent or parents despite the existence of the surrender. (Matter of E. W. C., 89 Misc 2d 64 [Sur Ct, Nassau County 1976].) Once an action is commenced the State automatically becomes a party to the contract and acts through the court as "parens patriae” to determine custody on the basis of what is best for the child. (Matter of Schenectady County Dept. of Social Servs. v Patricia S., 73 Misc 2d 104 [Fam Ct, Schenectady County 1973].) Before the court may return the child to the natural mother, the court must find that the parent is fit, competent and able to maintain, support and educate the child. (See, Social Services Law § 383 [1], [6].) Again, since the 1972 amendments, the parent who surrenders a child has no right to the custody of the child superior to that of the adoptive parents. (See, Social Services Law § 383 [6].)
Ms. Dunn seeks to have this court annul the surrender instrument she signed on May 1, 1986, and have the child removed from the home of John and Mary Doe and returned to her custody. She asserts, among other claims, that the surrender was secured by fraud, duress and coercion engineered by CHB and that the matter must not be determined on a pure "best interest standard” since the surrender was not recorded by the agency until after the revocation.
While the court is dismayed at some of the procedures employed by CHB, and the lack of candor portrayed by one or more witnesses on the stand, it cannot conclude that the surrender was procured by fraud, duress or coercion. This result is reached by reference to the testimony at the hearing. That testimony revealed that Ms. Dunn first met with Sister Rosalie of CHB on February 26, 1986; this meeting came about following a contact initiated by Ms. Dunn. Sister Rosalie, in conversation with Ms. Dunn, provided her with the three available options: keep the baby, place the baby in foster care and adoption. Sister Rosalie further testified that at that meeting she gave Ms. Dunn copies of the surrender agreement and all other pertinent adoption forms. Ms. Dunn chose to conclude her pregnancy at Nazareth Life Center. After several meetings over the next six or eight weeks with Cathy Howard, a social worker who covered Nazareth Life Center for CHB, one of several homes run by CHB for unwed mothers, Ms. Dunn was still uncertain as to which option she wished to exercise. Following the birth of the baby, Ms. Dunn sought counseling. She was provided with three names by Sister Rosalie. She chose one and attended two sessions, she broke *403 her third appointment and at or about that time, early in the last week of April, told Sister Rosalie that she had finally come to a decision and had concluded to surrender the baby for adoption. On May 1, 1986, Sister Rosalie met with Ms. Dunn at a Friendly’s Restaurant on Long Island and after more than an hour of conversation about her decision, Ms. Dunn signed the surrender. Ms. Dunn claims to have been fraudulently induced into signing the surrender due to a statement by Sister Rosalie to the effect that she could have the baby back upon her request, within 30 days. At the hearing, Sister Rosalie testified she told Ms. Dunn to be guided by the language of the surrender document and emphasized its critical importance; she testified quite differently at her deposition, taken only a week or so earlier. At pages 59, 60, 63 and 99, respectively, of the deposition transcript, we read:
"Q — Did you tell her she had 30 days to change her mind at any time? A — I did the first day I saw her.”
"Q — When you told her that she had 30 days to change her mind, are you referring to after she signed the surrender? A— That is right.”
"Q — What was the discussion? A — During the 30-day period, she had the opportunity of changing her mind.”
"Q — Did you tell Maureen if she wanted to change her mind, to notify Miss Shaw? A — I did.”
At the very least I must conclude that Sister Rosalie’s credibility on this issue was impeached. Nonetheless, her testimony must be juxtaposed with the undisputed facts including the following: Ms. Dunn is a college graduate having majored in English, she had the surrender in her possession perhaps since February 26, 1986, and admittedly since the early part of the last week in April, and she had mailed a copy of the instrument to her brother, a lawyer in Boston, Massachusetts. She spoke to her brother after he received the document and before she signed it. In short, the evidence is clear that while she agonized over the decision, she was not forced to sign anything and signed the surrender document only after seeking and obtaining professional counseling.
While Ms. Dunn testified she either didn’t read or didn’t understand the language of the document, the law presumes that a party to an agreement has read and understood a writing which she signs. (Fiorentino Assoc. v Green, 85 AD2d 419 [1st Dept 1982].) In Myers v Myers (197 App Div 1 [1st *404 Dept 1921]), a case not dissimilar to the one at bar, the court held that a parent who executed a consent to an adoption could not annul that consent upon the grounds that reliance had been placed on a verbal agreement that the child would be returned upon demand.
While I do not find fraud in the execution of the surrender document, assuming, arguendo, that there was fraud, it seems the court must nonetheless determine custody and that determination must be governed by the best interest test. We read in Matter of Danielson (104 Misc 2d 33 [Fam Ct, Rensselaer County 1980]), that the court, after it found coercion in connection with the signing of the surrender instrument, went on to determine custody and did so in accordance with the best interests tests. Moreover, upon reading Matter of Female F. D. (105 Misc 2d 866 [Sur Ct, Nassau County 1980]), we find that while the court held that the mother’s consent was induced by duress and it set aside the surrender, it referred the matter to the Family Court for a determination regarding custody and directing that the determination be made in the best interests of the child.
Parenthetically, while there is no question that the surrender of one’s child is a difficult and painful decision, additional changes in the law could go far towards ameliorating some of the trauma connected with this experience. While the 1972 amendments went a long way in this direction, I share the thought expressed by the Committee on Family and Child Welfare in its memo commenting on those bills (bill jacket to L 1972, ch 639, at 40), i.e., consideration should be given to a requirement that every surrender for adoption should be executed before a Judge and accompanied by an allocution.
Helpful too might be a requirement that an agency use larger type and clearer language for that portion of the surrender instrument which details what happens when and if a natural mother revokes consent within a 30-day period. It is most important that the language convey that such a revocation does not provide an automatic opportunity to retain the child, but rather it generally simply triggers a hearing to determine where custody should be awarded, in accordance with the best interests of the child.
Ms. Dunn’s claim that this is not a best interests hearing but rather that Ms. Dunn has a superior right to her child due to the fact that the adoptive home recordation requirement was not complied with is imaginative but unpersuasive. *405 Under Social Services Law § 384 (5), the extent of a parent’s right to revoke a surrender must be spelled out in the surrender instrument. If 30 days have passed and the child is in an adoptive home, the parent is considered to have waived her rights, even to a hearing save for allegations of fraud, duress or coercion. Therefore, when a court entertains holding a hearing, it must first determine if the revocation is timely. A revocation is timely if 30 days have not elapsed or if the child has not been "placed in an adoptive home”. If the revocation is timely, then the court may proceed with a hearing in concert with Social Services Law § 383 (6). In either case when a hearing is permissible, custody must be determined and the test is the best interests of the child.
In the instant case, Ms. Dunn expressed her intent to revoke well within the 30-day period.
According to section 383 (6), in an action to revoke a surrender instrument and following the child being placed in an adoptive home, the natural mother loses her presumption of superiority and both the natural and adoptive parents stand on an equal footing. Here, the child was physically placed in an adoptive home on or about April 10, 1986. Petitioner, therefore, loses her superior right and the case must be heard on a pure "best interest” basis under section 383 (6). Section 384 (5) requires that in order for a child to be deemed to have been placed in an adoptive home, the names and addresses of the adoptive parents must be recorded in the agency’s bound volume. Petitioner contends that because these requirements were not met, the child cannot be considered to have been placed in an adoptive home pursuant to section 383 (6) and it follows she is entitled to the presumption of superiority and the return of her baby.
There is, however, a distinction between sections 383 (6) and 384 (5) relative to the definition of "placement in an adoptive home”. The technical definition of section 384 (5) which requires recording of the surrender only relates to the time period for revocation and has no effect on the natural parents’ and adoptive parents’ status under section 383 (6). As section 384 (5) specifically states these requirements are only "[f]or the purposes of this subdivision”.
Accordingly, the court must regard the parties as being on an equal footing and determine custody based on the child’s best interests.
After hearing all the testimony, including that of Ruth *406 Cohen, M.D., the opinion of this court is that the best interest of the child will be furthered by remaining with and being adopted by John and Mary Doe.
The natural mother is unmarried, 28 years old and only temporarily employed. She plans to raise the infant in her brother’s home. She is unsure what role, if any, the natural father, married and the father of two daughters, will play in the child’s life. Further, at least through the first trimester of her pregnancy, she continued smoking, drinking and using cocaine. She testified at the hearing that she is no longer an abuser.
The adoptive parents, both 29 years old, enjoy a stable marriage and are financially secure. There is stability and close family ties. These qualities are particularly significant since the baby was born with an Apgar of two and may develop health defects. As a consequence of the above, the natural mother is not in a position to assume the care of the child and custody must be awarded to the adoptive parents.